IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BALDEO TANEJA,

    Petitioner,

    v.

RONALD WEBER, WARDEN, and
ATTORNEY GENERAL OF MARYLAND

    Respondents.

Civil Action No.:  ELH-22-1419

**MEMORANDUM OPINION**

Baldeo Taneja, Petitioner, a Maryland State prisoner, has filed a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  ECF 1 (the "Petition").  Warden Ronald Weber and the Attorney General of Maryland ("Respondents") filed an answer to the Petition, asserting that the claims are either procedurally defaulted, non-cognizable, or lack merit. ECF 6 ("Answer").  Taneja replied.  ECF 8 ("Reply").

No hearing is required to resolve the matter.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2023); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons that follow, I shall deny the Petition.  And, a certificate of appealability shall not issue.

**I.    Background**

On November 22, 2013, Teneja and his wife, Raminder Kaur, were indicted in the Circuit Court for Montgomery County and charged with first degree premeditated murder, conspiracy to commit first degree murder, and use of a handgun in the commission of a crime of violence. ECF

6-1 at 8-10.  They were tried together by a jury from July 28 to August 7, 2014, and convicted as charged. ECF 6-15 at 29.

In particular, the victim, Preeta Gabba, was the former wife of the defendant.  She was shot three times at close range at about 7:45 a.m. on October 12, 2013, while walking to the bus to go to work.  *See Taneja v. State*, 231 Md. App. 1, 3, 149 A.3d 762, 764 (2016).

In presenting a summary of the evidence adduced at trial, I shall rely on the factual recitation set forth by the Maryland Court of Special Appeals ("CSA")[1] in its reported opinion issued on November 30, 2016.  *See Taneja*, 231 Md. App. at 4-9, 149 A.3d at 764-767; *see also* ECF 6-1 at 108-137:

> The State's theory of prosecution was that Taneja and Kaur conspired to kill Gabba, and that it was Kaur who fired the fatal shots. The State's case was largely circumstantial and centered on motive and opportunity. The State produced evidence that the gun used to kill Gabba was found in the rear seat of Taneja and Kaur's car 30 hours after the murder, and that Taneja had purchased the gun five weeks earlier. The defense argued lack of criminal agency and, more particularly, that others had motive to kill Gabba.
>
> ***
>
> Gabba and Taneja were married in India in 2002 and continued to live there for several years. In 2006, Taneja moved to the United States; Gabba followed in 2009. They lived in the Germantown area, but not together. Two years later, Gabba and Taneja divorced, and soon afterward Taneja married Kaur and moved to Nashville, Tennessee. Gabba remained in the Germantown area and moved to a condominium on Crystal Rock Drive.

---

[1] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved a change in the name of the Maryland Court of Special Appeals to the Appellate Court of Maryland.  These changes went into effect on December 14, 2022.  *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR.  However, I shall refer to the courts by the names that were in effect when any cited decisions were issued.

On the morning of Gabba's murder, she was en route to her job, walking from her home to the bus stop, as she had done regularly for the preceding three years. Three eyewitnesses testified to the events at the murder scene.

Elena Komarova was driving her teenage son to his school in the 19700 block of Crystal Rock Drive, a residential area, when they heard several gunshots. Komarova slowed her car and saw two women ahead of her. One of the women, later identified as Gabba, started crossing the street in the middle of the block, while the other woman was close behind her. As Gabba fell into the street in front of Komarova's car, the second woman ran away. Komarova and her son described the woman who ran away, in part, as wearing a bright orange scarf. They initially described both women as African-American, although, at trial, both were less positive about their race. Neither saw anyone else in the immediate area at the time. A man living in an apartment about 100 yards from where the shooting occurred testified that he heard gunshots and looked out his window. He saw a woman, later identified as Gabba, lying on the ground, and ten feet away another woman, who exhibited a slight limp, was running away. The witness described the woman who was running away as in her late 40's or early 50's with "brownish" skin color and wearing a bright head scarf. Like the Komarovas, he initially told the police that the woman was African–American, but, at trial, was less positive of her race.

Suspicion quickly fell on Taneja and Kaur. Several hours after the murder, around 3:30 p.m., Montgomery County Police Department homicide detectives called Taneja's cell phone, but it went directly to voice mail, as did several additional calls. Warrants were obtained for Taneja and Kaur, who were arrested in Tennessee around 2:00 p.m. the day following the murder, as they were driving away from their home. One of the detectives observed that Kaur walked with a limp.

The police searched the car and recovered a backpack containing a wig, black hair dye, a black hoodie, and a plastic bag. In the plastic bag was a .357 Ruger LCR revolver, which later testing and examination determined to be the murder weapon. The plastic bag also contained a holster for the .357 Ruger, and a 100 Ruger revolver. Inside Kaur's purse the police found a note in her handwriting that read: "You calm down. We are now in Tennessee near my home." A global positioning system device (GPS) was recovered from the front console of the car. Inside Taneja's wallet was a piece of paper on which Kaur had written Gabba's address.

A search of Taneja's residence recovered documents with a note on top in Kaur's handwriting that read, "Dragon story and other court documents." The police also

recovered a composition notebook with different handwriting that read, in part, "No brass, no evidence."

A medical examiner testified that Gabba had been shot three times in the upper chest and abdomen. The bullets had entered from the left side and traveled toward the right; two of the bullets entered the front part of her body, one entered from the back. Although two of the wounds were "rapidly fatal," the medical examiner testified that Gabba could have possibly walked several steps before falling.

Two firearm and tool mark identification experts testified that the three bullet specimens recovered from Gabba's body were all fired from the .357 Ruger LCR revolver that was recovered from Taneja's car. Taneja's DNA was found on both guns seized from his car.

The State also presented evidence to support its theory of Taneja's and Kaur's motive to kill Gabba, including that, in 2009, when Gabba moved to the United States from India, Taneja and Gabba were experiencing marital discord. While Gabba lived in a condominium in Germantown with one of Taneja's sons, Taneja and Kaur lived nearby and held themselves out as husband and wife.

In 2010, Gabba and Taneja began divorce proceedings, which became "very contentious" even though they had little property and no children together. The State introduced evidence that during the divorce proceedings, Taneja asked his son and Kaur to spy on Gabba, and that Taneja referred to Gabba as "Dragon Lady," as did his son and Kaur. At one point during the divorce proceedings, Gabba, acceding to Taneja's demand, left the family home. She later returned, pursuant to a court order, to find that Taneja had erected walls so she had access only from the entry door to her bedroom.

The State presented evidence that, although the divorce became final in July 2011, Taneja failed to honor their divorce agreements, and their interactions continued to be acrimonious. Indeed, at the time of Gabba's murder, Taneja still had not transferred their property in India as required by the divorce settlement, despite several requests by Gabba.

Additional evidence was offered by the State relating to Taneja's agreement, as part of the divorce settlement, to pay alimony in the amount of $2,400 each month for three years. Alimony was to terminate upon the death of either party. By February 2013, Taneja had fallen three months behind in his alimony obligation, prompting Gabba to send several demands for payment, via e-mail. Eventually, her attorney

filed a contempt petition against Taneja who, in response, filed a counterclaim for $100,000. The contempt hearing was scheduled for October 10, 2013, two days before the murder, but several days before the hearing, their attorneys negotiated an agreement whereby Taneja agreed to pay the arrears within 90 days.

The State also presented evidence of Taneja's and Kaur's opportunity to kill Gabba. About five weeks before Gabba's murder, Taneja attended a day-long gun training class in Tennessee. The class included four hours of instruction and four hours of shooting range experience that would allow him to obtain a "handgun carry permit." In his testimony, the instructor recalled that, at the first class, Taneja entered the classroom with a woman and sat in the last row. When the woman was asked to leave because she had not paid to attend the class, Taneja moved to the first row. The instructor particularly remembered Taneja because he took "a ton of" notes. Among the instructor's recommendations to the class participants was that they purchase a revolver rather than a semiautomatic, because the latter requires much more training for accuracy than a revolver. He further remembered telling the class that a semiautomatic "spits out" shell casings that can later be matched to the gun, but a revolver does not.

On September 28, 2013, two weeks before the murder, Taneja purchased two revolvers from a gun store in Tennessee: a .357 Ruger LCR, which was described as a snub-nosed revolver designed with a "concealed hammer" so it would not get hung up on clothing, and a 100 Ruger GP. Additionally, Taneja purchased a holster for the .357 and ammunition for both guns. Kaur was present in the store when Taneja purchased those items.

Around 7:00 p.m. on October 11, the night before the murder, Taneja and Kaur checked into the Red Roof Inn in Germantown, about eight miles from where Gabba was shot. From the GPS recovered from Taneja's car, the police learned that at 9:58 a.m. the next morning—October 12—the GPS device traveled toward the District of Columbia.

The evidence disclosed that both Taneja and Kaur were involved in Amway distribution and sales, Taneja since the early 1990's. On the weekend of October 11–13, 2013, Amway held a "Free Enterprise" weekend conference at the Washington Hilton, involving thousands of Amway members. The event started Friday night at 6:00 p.m. and lasted until Sunday at 3:45 p.m. Taneja's Amway sponsor testified that Taneja was aware of the importance of attending the conference.

At 10:44 a.m. on the morning of the murder, Taneja purchased two tickets for the conference. About 30 minutes later, the GPS revealed a stop near the Washington Hilton, a distance of about 19 miles from the Red Roof Inn. At 11:37 a.m., Taneja and Kaur entered the conference, where they were seen by Taneja's Amway sponsor and his wife shortly after they arrived. A short time later the sponsor texted Taneja, inviting him and Kaur to join their group for lunch. Taneja texted back that he could not make it because Kaur was not feeling well. The sponsor's wife testified that Kaur had not appeared unwell when she had seen her earlier. From the GPS device, the police determined that Taneja and Kaur attended the three-day event for less than an hour, leaving the D.C. area shortly after noon. Their car continued westward, stopping in Farragut, Tennessee around midnight. Their travel resumed the following morning around 9:30 and concluded at their home about noon.

After the State rested, Taneja called nine witnesses who testified as to his character trait for peacefulness.

Taneja also called several witnesses to support his theory that another person was the shooter. Specifically, he called: (1) Ms. Komarova to suggest that the woman who ran away did so out of fear of being shot; (2) two witnesses who testified that Taneja's current annual income was $150,000 to $175,000, to suggest that he had no financial motive to commit the crime; (3) Taneja's divorce attorney, who testified that Taneja was not displeased with the outcome of the divorce; (4) a gunshot residue expert to suggest that the woman near Gabba just before her death was not the shooter; and (5) a witness who testified that an indoor shooting range near the defendant's home in Tennessee was open on Sunday, to suggest that Taneja and Kaur were on their way to the shooting range with their guns when they were arrested leaving their house.

Sentencing was held on October 15, 2014. The court sentenced Taneja to life imprisonment. ECF 6-16 at 25.

Taneja appealed his conviction to the CSA. ECF 6-1 at 24-64. He asserted a single ground, as follows, *Taneja*, 231 Md. App. at 4, 149 A.3d at 764 (capitalization omitted): "Whether the trial court violated Taneja's due process right to present a defense by excluding several defense witnesses who were present in the court and ready to testify concerning the defense's theory of the crime[.]" As noted, on November 30, 2016, the CSA affirmed the convictions. ECF 6-1 at 108-

136. The Mandate issued on December 30, 2016. ECF 6-1 at 137. Thereafter, the Maryland Court of Appeals denied Taneja's petition for a writ of certiorari (*id.* at 138-160, 169) and his request for reconsideration. *Id.* at 170-176; *see also Taneja v. State*, 452 Md. 549, 157 A.3d 822 (Table) (2017).

Taneja filed a pro se Petition for Post-Conviction Relief in the Circuit Court for Montgomery County on June 29, 2021. ECF 6-1 (State Record Volume I), at 177-185. It was later amended and supplemented by counsel. *Id.* at 186-545, 615-616; ECF 6-2 at 617-627. Ultimately, Taneja asserted nine claims, ECF 6-2 (State Record Volume II), at 649-650:

1. The admission of fundamentally flawed firearm identification evidence violated Petitioner's right to a fair trial under the Due Process Clause of the United States Constitution and the Maryland Declaration of Rights;

2. Trial counsel rendered ineffective assistance by not moving in limine to exclude the firearms examiner's testimony for lack of sufficient factual basis as required by Md. Rule 5-702;

3. Trial counsel rendered ineffective assistance by not cross-examining the firearms examiners;

4. Trial counsel rendered ineffective assistance by not objecting to the State's improper closing arguments which undermined the State's burden of proof;

5. The cumulative effect of trial counsel's errors warrants a new trial;

6. Trial counsel rendered ineffective assistance by failing to object and preserve for appellate review the issue of the compound strong feelings *voir dire* question;

7. Trial counsel rendered ineffective assistance by failing to object to the accomplice liability jury instruction;

8. Appellate counsel rendered ineffective assistance by not asking on direct appeal whether the trial court erred in declining to give the missing evidence instruction;

9. Trial counsel failed to contribute [certain] questions to the trial court to ask potential jurors during their *voir dire*. . . .

Following a hearing on Taneja's post-conviction petition (ECF 6-17) on November 23, 2021, the circuit court denied the petition by Memorandum Opinion of December 2, 2021. ECF 6-2 at 649-671. Thereafter, Taneja filed an application for leave to appeal to the CSA (*id.* at 672-704), but it was denied by the CSA. *Id.* at 705.

The Petition followed on June 13, 2022. ECF 1. Taneja asserts five grounds for relief, as follows: (1) "The trial court violated Taneja's due process rights as guaranteed by the U.S. Constitution and the Maryland Declaration of Rights to present a defense by excluding several defense witnesses who were present in the court and ready to testify concerning the defense's theory of the crime." (*Id.* at 8); (2) "The admission of fundamentally flawed firearm evidence violated Petitioner's right to a fair trial under the Due Process Clause of the United States Constitution and the Maryland Declaration of Rights." (*Id.* at 11); (3) "Trial counsel rendered ineffective assistance by not moving *in limine* to exclude the State's firearms examiners' testimony for lack of sufficient factual basis as required by Md. Rule 5-702 (modeled after Federal Rules of Evidence 702)." (*Id.* at 13); (4) "Trial counsel rendered ineffective assistance by not cross-examining the State's firearms examiners thus violating Taneja's right under the Confrontation Clause of the U.S. Constitution." (*Id.* at 15); and (5) "Ttrial counsel rendered ineffective assistance by not objecting to the State's improper closing arguments which undermined the State's burden of proof." (*Id.* at 19).

In their Answer, Respondents urge the Court to dismiss the Petition. ECF 6. They argue that Ground Two is procedurally defaulted and not cognizable on federal habeas review (ECF 6 at 45-46) and that the remaining grounds lack merit. *Id.* at 32-44, 46-62.

## II.    Standard of Review

The Petition seeks habeas corpus relief pursuant to 28 U.S.C. § 2254.  In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court has the power to grant a petition for a writ of habeas corpus "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see Shoop v. Twyford*, 596 U.S. 811, 818 (2022); *Wilson v. Corcoran*, 562 U.S. 1 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

In *Shoop*, the Supreme Court explained, 596 U.S. at 818 (internal parallel citations omitted):  "Congress enacted AEDPA 'to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases,' *Woodford v. Garceau*, 538 U.S. 202, 206 (2003), and to advance 'the principles of comity, finality, and federalism,' *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (*Michael Williams*). It furthered those goals 'in large measure [by] revising the standards used for evaluating the merits of a habeas application.' *Garceau*, 538 U.S. at 206."

Notably, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Larry v. Branker*, 552 F.3d 356, 368 (4th Cir. 2009).  Indeed, "Federal courts owe state tribunals 'significant deference' with respect to 'their determination that a state prisoner isn't entitled to habeas relief.'" *Crockett v. Clarke*, 35 F.4th 231, 241 (4th Cir. 2022) (citation omitted); *see Nicolas v. Att'y Gen. of Maryland*, 820 F.3d 124, 129 (4th Cir. 2016) (stating that a federal court "reviewing a habeas petition that has already been adjudicated on the merits in state court [must] give considerable deference to the state court decision.").

If a state prisoner's claim has already been adjudicated on the merits, § 2254 restricts federal habeas relief to limited circumstances. In *Shoop*, the Supreme Court explained, 596 U.S. at 818-19 (internal parallel citations omitted):

> Pertinent here, § 2254(d) provides that if a claim was adjudicated on the merits in state court, a federal court cannot grant relief unless the state court (1) contradicted or unreasonably applied this Court's precedents, or (2) handed down a decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The question under AEDPA is thus not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable—"a substantially higher threshold" for a prisoner to meet. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Harrington v. Richter*, 562 U.S. 86, 102–103 (2011).

AEDPA also limits the ability of a federal habeas court "to develop and consider new evidence." *Shoop*, 596 U.S. at 819. The *Shoop* Court said, *id.* (internal parallel citation omitted): "Review of factual determinations under § 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceeding.' And in *Cullen v. Pinholster*, 563 U.S. 170 (2011), we explained that review of legal claims under § 2254(d)(1) is also 'limited to the record that was before the state court.' *Id.,* at 181." As the Court put it, 596 U.S. at 819: "This ensures that the 'state trial on the merits' is the 'main event, so to speak, rather than a tryout on the road for what will later be the determinative federal habeas hearing.'" *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) (internal quotation marks and parallel citation omitted).

Under 28 U.S.C. § 2254(d)(1), the prisoner must show that the state court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Wills v. Pszczolkowski*, 125 F.4th 534, 538 (4th Cir. 2025). And, under § 2254(d)(2), the writ may be granted if a decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Wills*, 125 F.4th

at 538.  Therefore, a federal court is precluded from granting habeas corpus relief "'on a claim decided on the merits in a state court unless it determines the state court's decision was contrary to, or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the record evidence.'"  *Crockett*, 35 F. 4th at 235; *see Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 364–65 (2000); *see* 28 U.S.C. § 2254(d)(1). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 407.

For purposes of § 2254(d)(1), "clearly established Federal law" refers only to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions."  *White v. Woodall*, 572 U.S. 415, 419 (2014) (cleaned up).  As to "unreasonable application," the Supreme Court explained in *Williams (Terry)*, 529 U.S. at 407 (O'Connor, J., delivering the majority opinion with respect to Part II):

> [A] state-court decision can involve an "unreasonable application" of [the Supreme] Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application ... if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case.  Second ... if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

> I discuss these concepts in more detail, *infra*.

A § 2254 petition must also set forth specific grounds for relief. *Samples v. Ballard*, 860 F.3d 266, 273 (4th Cir. 2017); *see Folkes v. Nelsen*, 34 F.4th 258, 267 (4th Cir. 2022). Claims by a state prisoner that he is in custody in violation of the Constitution or the laws of the United States "implicate concerns about federalism and comity[.]" *Crockett*, 35 F.4th at 241. And, concerns regarding comity and federalism "reach their apex" when a state court has previously ruled on an alleged wrongful conviction. *Valentino v. Clarke*, 972 F.3d 560, 575 (4th Cir. 2020). Therefore, "the standard for such claims is exceedingly high." *Crockett*, 35 F.4th at 241; *see Burt v. Titlow*, 571 U.S. 12, 19 (2013).

Of import, "[t]he State possesses primary authority for defining and enforcing the criminal law, and for adjudicating constitutional challenges to State convictions." *Shinn v. Ramirez*, 596 U.S. 366, 376 (2022) (internal quotation marks and citations omitted). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge." *Davis v. Ayala*, 576 U.S. 257, 276 (2015) (internal quotation marks and citations omitted). Therefore, § 2254 "is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." *Williams (Terry)*, 529 U.S. at 383; *see Walters v. Martin*, 18 F.4th 434, 441 (4th Cir. 2021).

The Fourth Circuit has characterized the habeas standard as "an extraordinary standard of review." *Crockett*, 35 F.4th at 235. Accordingly, the habeas court may not disturb a state court judgment "absent an error that lies "'beyond any possibility for fair-minded disagreement.'"" *Mays v. Hines*, 592 U.S. 385, 386 (2021) (per curiam) (citations omitted); *see Walters*, 18 F.4th at 441.

In assessing a petitioner's habeas claims, the district court looks to the opinion of "'the last reasoned decision of a state court addressing the claim.'" *Allen v. Stephan*, 42 F.4th 223, 247 (4th Cir. 2022) (quoting *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017)), *cert. denied sub nom. Chestnut v. Allen*, 143 S. Ct. 2517 (2023). And, the federal court's review of a state court decision under § 2254 is conducted "through a narrow lens . . . ." *Mahadi v. Stirling*, 20 F.4th 846, 854 (4th Cir. 2021). It requires a review of "the record in its entirety," as it existed before the last state court to consider the matter. *Id.*; *see Mays*, 592 U.S. at 392; *Hyman v. Hoekstra*, 41 F.4th 272, 274 (4th Cir. 2022).

To obtain relief, the petitioner must identify the "clearly established" legal principle on which he relies. As noted, to qualify as "clearly established" a principle must originate from an actual Supreme Court holding, not from its passing dicta. *See Woodall*, 572 U.S. at 419. And, the holding must be described with specificity. *See Brown v. Davenport*, 596 U.S. 118 (2022). A holding at a "high level of generality" will not suffice. *Lopez v. Smith*, 574 U.S. 1, 6–8 (2014) (per curiam) (citation omitted); *see Metrish v. Lancaster,* 569 U.S. 351, 367–68 (2013). Moreover, circuit precedent cannot turn "'a general principle of Supreme Court jurisprudence into a specific legal rule'" that has not been "announced" by the Supreme Court. *Lopez*, 574 U.S. at 7 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

For a state court's decision to be contrary to established federal law, the state court must have arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or must have confronted facts that are "materially indistinguishable from a relevant Supreme Court" case but nevertheless arrived at the opposite result. *Williams (Terry)*, 529 U.S. at 405; *see Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014); *Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005). However, a federal habeas court "'may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.'" *Lovitt*, 403 F.3d at 178 (quoting *Williams (Terry)*, 529 U.S. at 411).

Rather, the state court's application of federal law "must also be unreasonable." *Lovitt*, 403 F.3d at 178; *see Nicolas*, 820 F.3d at 129 (The court "cannot disturb the State court's ruling simply because it is incorrect; it must also be unreasonable."); *Barnes*, 751 F.3d at 238-39 (a state court's decision is an unreasonable application of clearly established federal law when the state court identifies the correct governing principle but unreasonably applies that principle to the facts). Under § 2254(d)(1), to be "unreasonable," the state court's application of that law must be "objectively unreasonable," not merely incorrect. *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020); *see Woodall*, 572 U.S. at 419; *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). To warrant that description, a state court must have committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Section 2254(d)(2) of 28 U.S.C. requires a prisoner to show that the state court proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Crockett*, 35 F.4th at 241. Factual determinations are unreasonable when they are "'sufficiently against the weight of the evidence . . . .'" *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019) (citation omitted). In other words, the "federal court must conclude not only that the state court's determination was wrong, but that it was *unreasonable* in light of the evidence presented, that is, it is not 'debatable among jurists of reason.'" *Merzbacher v. Shearin*, 706 F.3d 356, 368 (4th Cir. 2013) (emphasis in original) (internal citation omitted).

However, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (citation omitted); *see Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* This standard is "meant to be" one that is "difficult to meet…" *Harrington*, 562 U.S. at 102.

Of relevance, the habeas court "must presume that the state court's factual findings are correct unless the petitioner rebuts those facts by clear and convincing evidence." *Nicolas*, 820 F.3d at 129; *see Harrington*, 562 U.S. at 100-01; *Walters*, 18 F.4th at 442; 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell,* 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.*

Taneja faces an additional hurdle if he alleges a trial court error that the State court subjected to harmless error review. Under these circumstances, a federal court cannot grant habeas relief without applying both the test outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and the deferential review required by AEDPA. *Brown*, 596 U.S. 118.

*Brecht* requires a state prisoner seeking to challenge his conviction in collateral federal proceedings to show that the error had a "'substantial and injurious effect or influence'" on the outcome of his trial. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "'substantial and injurious effect or influence'" requires "actual prejudice." *Brecht*, 507 U.S. at 637. "[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy

either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." *Brown*, 596 U.S. at 134 (emphasis in *Brown*).

In sum, for Petitioner to succeed on any of his claims of error he must convince this federal habeas court that there is "'grave doubt'" about "whether the [alleged] trial error affected the verdict's outcome." *Id.* at 135-36. Taneja must also demonstrate that every "fairminded jurist would agree that an error was prejudicial." *Id.* at 136. As discussed in below, these standards foreclose Taneja's claims.

## III. Procedural Default

Procedural default occurs when a habeas petitioner fails to present the claim to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim. *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A procedural default may also occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) ("When a petitioner fails to comply with state procedural rules and a state court dismisses a claim on those grounds, the claim is procedurally defaulted."). As the Fourth Circuit has explained, "if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Breard*, 134 F.3d at 619 (citing *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991)).

For a person convicted of a criminal offense in Maryland, exhaustion may be accomplished either on direct appeal or in post-conviction proceedings. To exhaust a claim on direct appeal in non-capital cases, a defendant must assert the claim in an appeal to the Appellate Court of

Maryland and then to the Supreme Court of Maryland by way of a petition for writ of certiorari. *See* Md. Code (2020 Repl. Vol., 2024 Supp.), §§ 12-201, 12-301 of the Courts and Judicial Proceedings Article ("C.J."). To exhaust a claim through post-conviction proceedings, a defendant must assert the claim in a petition filed in the circuit court in which the inmate was convicted, due within ten years of the date of sentencing. *See* Md. Code (2018 Repl. Vol., 2024 Supp.), §§ 7-101–7-103 of the Criminal Procedure Article ("C.P."). After a decision on a post-conviction petition, further review is available through an application for leave to appeal filed with the Appellate Court of Maryland. *Id.* § 7-109. If the Appellate Court of Maryland denies the application, there is no further review available, and the claim is exhausted. C.J. § 12-202.

As noted, procedural default occurs when a habeas petitioner fails to exhaust such available state remedies and "'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Breard*, 134 F.3d at 619 (quoting *Coleman*, 501 U.S. at 735 n.1). Maryland law does not permit a second and successive state petition for post-conviction relief. *See* C.P. § 7-103(a).

Respondents argue that Ground Two, which was asserted in Taneja's Petition for Postconviction Relief, is procedurally defaulted because the circuit court dismissed it per C.P. § 7-106(b)(1) for failure to raise the claim on direct appeal. C.P. § 7-106(b)(1) is an independent and adequate state ground sufficient to bar federal habeas review. *See Hopkins v. Goins-Jhnson*, CV PWG-13-3336, 2016 WL 5477560, at *5 (D. Md. Sept. 29, 2016), *aff'd sub nom. Hopkins v. Goins-Johnson*, 678 F. App'x 94 (4th Cir. 2017); *Nivens v. Morgan*, No. TDC-16-2648, 2019 WL 6067407, at *4 (D. Md. Nov. 15, 2019), *aff'd in part, dismissed in part,* 831 F. App'x 75 (4th Cir. 2020).

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that the failure to consider the claim on the merits would result in a miscarriage of justice, specifically, the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Breard*, 134 F.3d at 620. "Cause" consists of "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (quoting *Murray*, 477 U.S. at 488). To demonstrate prejudice, the petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982); *see Murray*, 477 U.S. at 494.

Under the second exception, a petitioner may obtain review of a procedurally defaulted claim if the case "falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). Such cases are generally limited to those for which the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496.

Neither exception to the procedural default bar applies here. Taneja argues in his Reply (ECF 8) that Ground Two should not be considered procedurally defaulted because his appellate counsel was ineffective for failing to include it in his direct appeal. *Id.* at 9-11. An attorney's failure to present an issue on direct appeal can constitute cause for procedural default, but only if that failure violated the Sixth Amendment's right to counsel. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray*, 477 U.S. at 488–89). "In other words, ineffective assistance adequate

to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Id.* "[P]rinciples of comity and federalism" require that such an ineffective assistance claim "'be presented to the state courts as an independent claim before it may be used [in a § 2254 proceeding] to establish cause for a procedural default.'" *Id.* at 451, 452 (quoting *Murray*, 477 U.S. at 489). This second claim of ineffective assistance of counsel is *itself* subject to procedural bar, and if this claim was not properly raised before the state court, it cannot serve as 'cause.' *Edwards,* 529 U.S. at 453.

The record reflects that Taneja raised a claim of ineffective assistance of appellate counsel in his Petition for Postconviction Relief. ECF 6-1 at 189-191. But, he voluntarily dismissed the claim (*id.* at 615-16) and did not include it in his application for leave to appeal. ECF 6-2 at 672-704. To properly exhaust a post-conviction claim in Maryland, the claim must be fairly presented to *both* the post-conviction court and to the Appellate Court of Maryland (or CSA) in an application for leave to appeal. *See Allen v. Acting Warden of WCI*, PX-17-2917, 2019 WL 3323181, at *2 (D. Md. July 24, 2019). Thus, Taneja's claim of ineffective assistance of appellate counsel is procedurally defaulted, and it cannot serve as cause to excuse the procedural default of Ground Two.

In any event, as discussed below, even if Ground Two were not procedurally defaulted, it is subject to dismissal for lack of merit.

## IV.    Discussion

### A.  Ground One

Taneja argues in Ground One that the trial court denied his right to due process when it prevented him from calling three defense witnesses: Deepinder Singh, Dan Wright, and Utsav Taneja. ECF 1 at 8-10. Particularly, Taneja contends that he was prevented from presenting a

defense that Singh, the son of Raminder Kaur, had the "motive, opportunity, and means" to kill Gabba. *Id.* at 9.

Petitioner made the same argument to the CSA on direct appeal. Citing *Washington v. Texas*, 388 U.S. 14 (1967), *Holmes v. South Carolina,* 547 U.S. 319 (2006), and *Taylor v. Illinois*, 484 U.S. 400 (1988), the CSA concluded that the trial court did not deny Taneja's right to a complete defense by excluding the proposed witnesses. ECF 6-1 at 116-135.

The defense argued at trial that the witnesses would establish that Singh filed a replevin suit against Gabba, alleging that she destroyed his personal items, had familiarity with guns, was in the area the morning of the shooting, and once made the comment "somebody should kill the bitch." *Id.* at 120-121. The CSA determined that the testimony that the excluded witnesses would have offered was "only tangentially relevant and had a high probability of confusing, distracting, and misleading the jury." *Id.* at 126.

 "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 690 (1986).  Evidentiary rules that "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" violate the right of the accused to present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotations and alterations omitted). However, "[o]nly rarely" has the Supreme Court held "that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).

In the Petition, Taneja renews the argument he raised on direct appeal, but he fails to explain how the CSA's opinion is contrary to or an unreasonable application of federal law. ECF

1 at 8-10. Indeed, the trial court's decision to exclude the witnesses was rendered after opportunity for significant argument by the parties and pursuant to Maryland evidence rules on relevancy. ECF 6-13 at 160-203. Specifically, the trial court stated, *id.* at 197-98:

> I am very mindful that this is a murder case. I'm very mindful of the defendant's right to put on a defense. But I don't believe that that right supersedes the require[ment that] the evidence be somehow relevant.
>
> And when I look at all of the facts in this case, it's inconceivable to me from the facts that you've proffered that this witness would testify that any jury could reasonably infer from that particular evidence that any fact that would tend to make more probative the defense in this case, that your client was not directly involved in the shooting or that your client was only an accessory after the fact.
>
> . . . I therefore don't believe that the evidence is relevant evidence, and will preclude you from calling him in front of the jury. And for the same reason, preclude you from calling the other two witnesses to the extent their testimony relates to testimony that his motive to want to shoot Preeta.

In my view, a fairminded jurist would not conclude that the trial court's exclusion of the proffered testimony, which was intended to cast suspicion on Kaur's son, was arbitrary or the denial of a complete defense. Ground Two is subject to dismissal for lack of merit.

### B.  Ground Two

In Ground Two, Taneja contends that his due process rights were violated because the trial court admitted "fundamentally flawed firearm evidence." ECF 1 at 11. Even if this claim were not procedurally defaulted, it lacks merit.

Taneja argued Ground Two in his Petition for Postconviction Relief. The circuit court concluded that Taneja's argument relied on an evidentiary principle and not a constitutional one, it "cannot find that this evidentiary issue implicates fundamental due process," and "the evidence was not of such a quality that would necessarily prevent a fair trial." ECF 6-2 at 657.

"[I]n considering federal habeas corpus issues involving state evidentiary rulings, [federal courts] do not sit to review the admissibility of evidence under state law unless

erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding. It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008) (internal citation and quotation marks omitted); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

In his Petition, Taneja argues that the State's firearms examiners' conclusions were "scientifically inaccurate, untrustworthy, and unreliable." ECF 1 at 11. He bases his argument on the testimony of his postconviction expert, Marc Dupre, who criticized the failure of the State's experts to examine the subclass characteristics of the firearm. ECF 6-17 at 67, 125.

As noted by the State circuit court, Taneja's argument sounds in evidentiary principles—not constitutional ones. ECF 6-2 at 657. Taneja cites no United States Supreme Court precedent that supports a conclusion that a due process error occurs when a firearms examiner fails to examine subclass characteristics. The circuit court's dismissal of Ground Two was neither contrary to nor an unreasonable application of federal law.

Petitioner's failure to establish that the trial court committed an error of constitutional dimension is fatal to federal habeas corpus relief. If Ground Two were not procedurally defaulted, it would be dismissed for lack of merit.

## C. Grounds Three and Four

In Ground Three Taneja argues that his trial counsel was ineffective for failing to file a motion in limine to exclude or limit the State's firearms examiners' testimony. ECF 1 at 13-15. In

Ground Four he contends that his counsel was ineffective and violated his right of confrontation for failing to cross-examine the State's firearms experts at trial. *Id.* at 15-19.

At the postconviction hearing Taneja's trial counsel testified that he did not believe that he had a viable motion in limine or he would have filed one. ECF 6-17 at 137. Trial counsel consulted two firearms experts before trial, Lawden Yates and Richard Ernest. *Id.* Trial counsel decided not to call either expert at trial because he learned from the State that Yates would be impeached and Ernest gave an unhelpful opinion that the bullets from the crime scene matched Taneja's gun. *Id.* at 148-150.

Taneja offered the testimony of firearms and tool mark expert Mark Dupre during the postconviction hearing. *Id.* at 60-93, 125-130. Dupre testified that the State's firearms examiners failed to properly document their findings, which undermined confidence in their result. As noted, he also criticized the State's experts for failing to consider subclass characteristics in their examination of Taneja's gun. ECF 6-17 at 66-81. Dupre did not conduct any independent tool mark testing of the gun. *Id.* at 85.

The circuit court concluded that trial counsel's performance was not deficient for failing to file a motion in limine or cross examine the State's experts because these decisions were based on sound strategy formulated after consultation with experts.  The court said, ECF 6-2 at 658-660:

> Petitioner further argues that trial counsel should have filed motion in limine based upon Md. Rule -702 to limit the scope of the firearm examiner's testimony based on the discipline's fundamental flaws to the extent they were known at the time of trial. However, Petitioner acknowledges that the examiner's testimony was widely accepted and reliable at the time of trial…
>
> ***
>
> Trial counsel's theory was that another person, Deepinder Singh, was the shooter, who was related to the victim, had a motive, and had access to the weapon. Relying on his own expert's opinion that the gun was a match, the Court cannot say that trial counsel's strategy was constitutionally infirm.

***

As *Strickland* states "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* Trial counsel's strategy was that someone else with access to the weapon committed the crime. That strategy did not objectively necessitate challenging the examiner on cross-examination.

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017); *United Staters v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015). To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged framework set forth in *Strickland*, 466 U.S. at 687-88; *see Williams (Terry)*, 529 U.S. at 390; *United States v. Sutherland*, 103 F.4th 200, 207-08 (4th Cir. 2024); *United States v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Hall*, 771 F. App'x 226, 227 (4th Cir. 2019) (per curiam); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).

First, the petitioner must show that counsel's performance was constitutionally deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Premo v. Moore*, 562 U.S. 115, 121 (2011); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *United States v. McNeil*, 126 F.4th 935, 942 (4th Cir. 2025); *Winbush*, 922 F.3d at 229. And, the petitioner must prove his claim by a preponderance of the evidence. *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021) (4th Cir. 2021; *United States v. Pettiford*, 612 F.3d 270, 277 (2010).

With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington*, 562 U.S. at 104; *Sutherland*, 103 F.4th at 207–08; *United States v. Richardson*, 820 F. App'x 225, 225 (4th Cir. 2020) (per curiam); *Powell*, 850 F.3d at 149; *Hall*, 771 F. App'x at 227. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has made clear that the "first prong sets a high bar." *Buck*, 480 U.S. at 118; *see Powell*, 850 F.3d at 149. Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 480 U.S. at 118 (citation omitted). The standard for assessing such competence is "highly deferential" and carries a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669. Judicial scrutiny of counsel's performance must be "'highly deferential'" and not based on hindsight. *Stokes v. Stirling*, 10 F.4th 236, 246 (4th Cir. 2021) (citing *Strickland*, 466 U.S. at 689).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the *Strickland* standard must be applied with scrupulous care," because "the standard of judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105; *see United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019). Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge

a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence v. Branker*, 517 F.3d 700, 708 (4th Cir. 2008) (quoting *Strickland*, 466 U.S. at 689); *see Cullen*, 563 U.S. at 189; *Harrington*, 562 U.S. at 104; *Richardson*, 820 F. App'x at 225-26; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687; *see Thornell v. Jones*, 602 U.S. 154, 155 (2024) (death penalty case).

As indicated, a strong presumption of adequacy attaches to trial counsel's conduct. *Strickland*, 466 U.S. at 696. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal

to a petitioner's claim.  As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

Taneja argues that his counsel was ineffective because he failed to "ask the defense experts to determine whether [the] State's forensic analyses were appropriately conducted and documented" and "[a] vigorous cross-examination of State's experts was the only appropriate way to attack the scientifically inaccurate, untrustworthy, and unreliable forensic examination results." ECF 1 at 14, 16. But Taneja has failed to provide the Court with a viable argument that overcomes the double deference due to trial counsel's strategy decisions and the circuit court's conclusions.

For Ground Three, Taneja also fails to provide the Court with any authority that a motion in limine would have been granted under the circumstances. Taneja's postconviction expert criticized the adequacy of the State's experts' documentation, but did not testify that the State's experts deviated from the accepted methodology in the field of firearms and tool mark identification. ECF 6-17 at 60-93, 125-130. As noted above, Taneja conceded during the postconviction proceedings that the methods of the State's experts were "widely accepted." ECF 6-2 at 659.

For Ground Four, Taneja's Petition includes a litany of hypothetical questions his counsel could have asked the State's experts on cross-examination. ECF 1 at 18-19. But, *Strickland* specifically prohibits courts from second-guessing trial counsel's strategy decisions using the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. The scope of cross-examination is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel. *Hutchins v. Garrison,* 724 F.2d 1425, 1436 (4th Cir. 1983). In any event, neither the expert retained by Taneja's trial counsel nor his postconviction expert could provide an opinion that contradicted the State's experts' opinion that the bullets from the crime

scene matched his gun. So, Taneja cannot demonstrate that there are any questions that could have been asked on cross-examination that would have changed the outcome of his trial.

Taneja also argues that his trial counsel violated his rights under the Confrontation Clause by failing to cross-examine the firearms examiners. The Confrontation Clause provides that "the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has interpreted the Clause as prohibiting the admission of "testimonial" statements from an unavailable declarant unless the defendant had a prior opportunity to cross-examine that declarant. *Crawford v. Washington,* 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination").

The Confrontation Clause does not require attorneys to cross-examine witnesses; rather, it bars admission of testimonial statements of a witness who did not appear at trial. Taneja's trial counsel's strategic decision not to cross-examine the firearms examiners is not a violation of his confrontation rights and any claim for ineffective assistance of counsel for failure to protect his rights under the Confrontation Clause is without merit.

Considering the deference owed, both to trial counsel's tactical decisions and to the circuit court's conclusions, Taneja's claims in Ground Three and Four that his counsel was ineffective for failing to file a motion in limine and failing to cross-examine the state's firearms experts are without merit.

### D.  Ground Five

In Ground Five, Taneja contends that he is entitled to habeas relief because his counsel was ineffective for failing to object to the prosecution's closing argument that undermined the state's burden of proof. ECF 1 at 19-21. Taneja contends that his counsel should have objected to the

following comments made by the prosecutor with regard to reasonable doubt, ECF 6-14 at 111-114:

> Let me give you some examples. Let's say you have to have surgery and you go to the hospital. Think of a reputable hospital in your mind. You go to the hospital. You may know the doctor, you may not. You probably the doctor [sic] who refers you to the surgeon but maybe you'd met the surgeon too. You probably haven't met the anesthesiologist. And he walks in the room for the first time as you're laying on the bed and you put out your arm and he sticks in the needle to put you under because this is surgery where you have to be put under.
>
> And have you checked to see what chemicals he's actually putting in your body? Have you actually inspected and watched whatever it is, whatever tank or whatever is holding that chemical, have you inspected it? Are you a scientist and have you checked out that it has all the components that will put you under? Or are you convinced beyond a reasonable doubt--because you wouldn't submit to a stranger putting a needle in your arm and feeding chemicals in your body if you weren't. So why are you convinced beyond a reasonable doubt that it's anesthesia and that you're going to be okay and you're going to wake up? Because it's a reputable hospital. Because it's a reputable doctor who's referred you to this. Because you know people who undergo surgery all the time with anesthesia. Because of the way the anesthesiologist has behaved. There's no evidence to suggest that he is doing something out of the ordinary.
>
> Is it possible that he's a serial killer who's going to feed cyanide into your body? Everything's possible. But is it reasonable? And is it reasonable beyond a reasonable doubt? Yes, it is. And do you have to see that chemical made and constructed? And do you have to have met this anesthesiologist before? No. Because the circumstances surrounding it convinced you beyond a reasonable doubt that it's going to be okay. Even though there's this possibility that he's a serial killer and he's going to feed cyanide into your body. There's no evidence of that though. And so that is what I want you to stay away from.
>
> Another example, just because I think this might even hit home a little bit more. Those of us who have children, many of us put our children on a school bus. Fall is about to come. Many of us will load our children on that Montgomery County Public Schools school bus. So, when the bus arrives, the orange bus arrives, and it says Montgomery County Public Schools on it. The bus driver opens the door. You allow your child, your treasure in life, to go on this bus. Have you met the bus driver before? Have you interviewed the bus driver? Have you done a background check on the bus driver? Probably not.
>
> But still you let your child get in a vehicle with a driver you've never met before. Why? Because you're convinced beyond a reasonable doubt that they're going to take your child to the local school in which your child's enrolled. Why?

Because it's an orange bus that says Montgomery County Public Schools. It's arriving at the exact time that Montgomery County Public Schools said it would arrive, at the exact place Montgomery County Schools said it would arrive. And all the other children in the neighborhood are getting on. And all the circumstances indicate that this is the bus that takes your child to school. Even though you've never met that bus driver you're making a decision beyond a reasonable doubt to put your child on the bus.

Now imagine you're at work. You've watched the news here and there and nothing on the news. And no calls to you at work. Are you convinced beyond a reasonable doubt that your child got to school? You don't have an eyewitness saying, I saw your child get off the bus and walk into the school. You haven't heard that and you don't need that to be convinced beyond a reasonable doubt that your child got to school. Why? Because there's no evidence that they didn't. And all the circumstances surrounding the arrival at school convince you beyond a reasonable doubt that that's what happened even though there's no eye witness to it.

That's what we have here ladies and gentlemen. Could that bus driver have been a serial killer and killed all the children on the bus, God forbid? Anything's possible. Anything's possible. That's not mathematically or scientifically impossible. But there's no evidence of it and that's what we stick with when we make "beyond a reasonable doubt" decisions in our lives.

During the postconviction hearing, Taneja's trial counsel explained that there was a "dearth of case law" on reasonable doubt in Maryland and his strategy was to not object to the prosecution's argument so that he could "lean on" them for "professional comity" if the prosecution made an objection to his argument. ECF 6-17 at 141-143. The circuit court denied Taneja's postconviction claim, deferring to trial counsel's considered strategic decision to forgo an objection to the State's closing argument. ECF 6-2 at 661-664.

Taneja is not entitled to habeas relief on Ground Five. The circuit court properly deferred to counsel's strategic decision that withholding an objection may be beneficial leverage for the defense when arguing an unsettled area of law. Review of counsel's failure to object to a prosecutor's argument must be highly deferential, given the recognized tactical reasons that counsel may choose not to object. *Bennett v. Angelone*, 92 F.3d 1336, 1349 (4th Cir. 1996).

In any event, even if the prosecutor's comments were an incorrect statement of the law, Taneja would not be entitled to habeas relief because he cannot show prejudice. *See McHone v. Polk,* 392 F.3d 691, 708 (4th Cir. 2004) (holding there is no prejudice from prosecutor's misstatement of the law when the trial judge properly instructs the jury). The record reflects that the trial court properly instructed the jury on the burden of proof.  ECF 6-14 at 58-59.  And, it is fundamental in the law that "[a] jury is presumed ... to follow its instruction." *Weeks v. Angelone,* 528 U.S. 225, 234 (2000).

Taneja has failed to demonstrate that the circuit court's decision was contrary to or an unreasonable application of *Strickland*.  Ground Five is dismissed for lack of merit.

### V.  Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling."  *Id.*

31

Taneja has failed to satisfy this standard on any of his claims.  Therefore, a certificate of appealability shall not issue.

**VI.     Conclusion**

For the foregoing reasons, I shall deny Taneja's Petition for writ of habeas corpus.  And, I decline to issue a certificate of appealability.

A separate Order follows.


<u>March 6, 2023</u>                                   <u>          /s/                        </u>
Date                                                     Ellen L. Hollander
                                                         United States District Judge

32